```
                    UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,      )    02-CR-444-1
                               )
                               )
       vs.                     )
                               )
                               )
ANTHONY LAMAR WILLIAMS,        )
                               )    Philadelphia, PA
                               )    September 13, 2007
               Defendant.      )    12:03 p.m.
```

```
        TRANSCRIPT OF VIOLATION OF SUPERVISED RELEASE HEARING
            BEFORE THE HONORABLE JAMES T. GILES
                 UNITED STATES DISTRICT JUDGE
```

APPEARANCES:


For the Government:        DAVID E. TROYER, ESQUIRE
                          ASSISTANT UNITED STATES ATTORNEY
                          UNITED STATES ATTORNEY'S OFFICE
                          615 Chestnut Street
                          Suite 1250
                          Philadelphia, PA  19106-4476



For the Defendant:        WILLIAM J. BRENNAN, ESQUIRE
                          LAW OFFICES OF WILLIAM J. BRENNAN
                          100 North 18th Street
                          Two Logan Square
                          12th Floor
                          Philadelphia, PA  19103



Audio Operator:           FRANK W. HAUSER



Transcribed by:           DIANA DOMAN TRANSCRIBING
                          P.O. Box 129
                          Gibbsboro, New Jersey  08026-0129
                          Office:   (856) 435-7172
                          Fax:      (856) 435-7124
                          E-mail:   dianadoman@comcast.net



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                       <u>I N D E X</u>

2

3   <u>ARGUMENT</u>:                                    <u>PAGE NUMBER</u>

4   Re:  Violations

5      By Mr. Troyer                               4

6      By Mr. Brennan                              6

7   Re:  Sentence

8      By Mr. Troyer                              19

9      By Mr. Brennan                             31

10

11  <u>EXHIBITS</u>:                                    <u>ID.   EV.</u>

12  D-1  Letter from PHA Property Management        7

13

14  <u>STATEMENT BY THE CHARACTER WITNESS</u>:        <u>PAGE NUMBER</u>

15     By Baaqia Badia                            23

16

17  <u>STATEMENT OF THE DEFENDANT</u>:               <u>PAGE NUMBER</u>

18     By Anthony Lamar Williams                  25

19

20  <u>SENTENCE OF THE COURT</u>:                     <u>PAGE NUMBER</u>

21     By Judge Giles                             34

22

23

24

25

1            (The following was heard in open court at 12:03

2    p.m.)

3            MR. BRENNAN:  Good afternoon, Your Honor.

4            THE COURT:  Good afternoon.  Please be seated.

5            Appearances, please, counsel for the record.

6            MR. TROYER:  Good afternoon, Your Honor.  David

7    Troyer, Assistant U.S. Attorney for the United States.  I'm

8    accompanied today by United States Probation Officer, Jane

9    Schoonmaker.

10            MR. BRENNAN:  Good afternoon, Your Honor.

11    William J. Brennan,  CJA counsel for the defendant, Anthony

12    Lamar Williams, who's to my right at counsel table.

13            THE COURT:  Mr. Williams, would you please stand,

14    sir, to be sworn or affirmed.  Raise your right hand and state

15    your name.

16            THE DEFENDANT:  Anthony Lamar Williams.

17            ANTHONY LAMAR WILLIAMS, DEFENDANT, SWORN

18            COURTROOM DEPUTY:  Thank you.  Please be seated.

19            THE COURT:  What are the claimed violations?

20            What are the claimed violations?

21            MR. TROYER:  The violations in this case as outlined

22    in the -- in the petition are that the defendant failed to

23    report as directed to the probation officer and to the Court

24    and to submit complete written reports.

25            The defendant was reminded of his reporting

1    requirements and his drug testing requirements.  The defendant

2    failed to report on August 16th, 2006, September 13th, 2006,

3    September 20th, 2006, October 11th, 2006, November 16th, 2006,

4    November 21st, 2006, November 22nd, 2006, December 6th, 2006,

5    December 12th, 2006, December 13th, 2006, December 21st, 2006,

6    December 28th 2006, and January 4th, 2007.

7            He was also not available for a prearranged home

8    visit on November 20th, 2006.  As a result, these -- these are

9    violations of Grade C violations.  The last contact with Mr.

10   Williams with the Probation Office was at his home on

11   November 14th, 2006, and, after which time, Mr. Williams

12   absconded.

13           The next one is a violation of Standard Condition 7,

14   "The defendant shall refrain from excessive use of alcohol and

15   shall not purchase, possess, use, distribute or administer

16   controlled substances or any paraphernalia."

17           On September 15th, 2006, Mr. Williams tested

18   positive for morphine.  He did not have a prescription for

19   this medication.  After failing to provide a valid

20   prescription, he admitted on October 21st, 2006, that he may

21   have taken his girlfriend's prescription medication.  The next

22   one is -- that is also a Grade C violation.

23           The next one is that he shall participate -- "The

24   defendant shall participate in drug aftercare treatment

25   programs."

1          The -- since his violation hearing in August of

2    2006, he had advised that he was attending outpatient

3    appointments, was on a waiting list for an inpatient

4    appointment.  However, the defendant, after having been seen

5    at the Veteran's Administration and having been given an

6    inpatient bed on October 26th, 2006, Mr. Williams called the

7    V.A. and advised them that he needed a new date for

8    reporting, a new date for the bed because of alleged deaths in

9    his family.

10         A new date was given to him, however, he failed to

11   report to the inpatient program as agreed on November 7th,

12   2006, and he did not report back again after that.  That is

13   also a Grade C violation.

14         Those are the violations alleged in the current

15   petition.  Yeah.  And that -- there has been an arrest since

16   then.  Also, recently, in the City of Philadelphia, Mr. --

17   after Mr. Williams had absconded, that is how Mr. Williams was

18   brought back, once again, to this Court is -- is through an

19   arrest in the City of Philadelphia.

20         So, he was arrested on -- on yet another burglary

21   charge on July 14th, 2007, and having spent some time in the

22   City, he was recently released to the custody of the U.S.

23   Marshals for -- for the purpose of this hearing.

24         That case is pending by the way.  There was recently

25   a preliminary hearing.  He was held over for trial in that

1    case, but that case has not been disposed.

2              THE COURT:  Mr. Brennan.

3              MR. BRENNAN:  Your Honor, with respect to the

4    recitation of the violations, to my understanding having met

5    with Mr. Williams and having spoken prior to today's hearing

6    with Probation Office Schoonmaker, that Mr. Williams does not

7    contest the violations themselves and will stipulate to them.

8    He wishes, obviously, to address them and offer mitigation.

9              I do not represent him, Your Honor, on the local

10   case.  I have represented him for, I don't know, I guess the

11   better part of eight or nine years along with this Court and

12   Mr. Troyer, as CJA counsel.  His fiancé, Baaqia Badia, is here

13   in Court and reports to me as does Mr. Williams that the local

14   matter has been reduced to summary offenses but I am not

15   counsel in that case.  I -- I make that representation simply

16   as a conduit of the information that was passed on to me, not

17   as an officer of the Court.

18             Pardon me, Your Honor.

19             (Pause in proceedings.)

20             MR. BRENNAN:  Your Honor, the failure to report

21   allegations that we've addressed in the past, Mr. Williams

22   asks me to present to the Court -- and I'll show a copy --

23   I've just received this from Ms. Badia, that he has been

24   working.

25             I have a letter from -- I'll mark it as Defense 1

1   with the Court's permission for identification purposes, from

2   PHA Property Management, LLC, of 243 Glenside Avenue, Holmes,

3   H-O-L-M-E-S, PA, 19043 from Kelly Leahan, L-E-A-H-A-N,

4   indicating that Ms. Leahan certifies Mr. Williams was

5   subcontracted as a laborer of PHA Property Management from

6   February, 2007, through July, 2007.

7           Ms. Leahan is aware that Mr. Williams is

8   incarcerated and he will have a job with PS -- PHA when

9   released.  So I'll show it to counsel and submit it to the

10  Court for Your Honor's consideration.

11          Mr. Williams indicates to me that his job schedule

12  was such that he had to make decisions as to whether or not to

13  report or to lose the job.  He further reports to me and I'm

14  sure Ms. Schoonmaker can verify and will correct me if I'm

15  wrong, that while he did have some failures to report on his

16  scheduled visits, that he was, in fact, taking a drug test

17  which is -- may I hand this up, Your Honor?  And he --

18          THE COURT:  Yes.

19          MR. BRENNAN:  -- wishes the Court to take those into

20  -- those factors into consideration.  I believe Ms. Badia,

21  with the Court's permission, would like to speak on his

22  behalf.

23          THE COURT:  But first, Mr. Williams?

24          THE DEFENDANT:  Hm-hmm.

25          THE COURT:  The claims against you by the

Colloquy                                                    8

1   Prosecution have been reviewed here in Court.  Did you hear

2   those?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  Do you admit that you violated the

5   conditions of supervised release as stated?

6            THE DEFENDANT:  The Class C violation, as far as me

7   having an arrest pending, that arrest was dismissed.

8            THE COURT:  That matter's not before me.

9            THE DEFENDANT:  Okay.  As far as the -- not seeking

10  out -- outpatient treatment, I did seek outpatient treatment.

11  That was part of the dilemma because between the outpatient

12  treatment and my job and the home visits.  Ms. Schoonmaker

13  knew that I was working during the hours -- the daily hours so

14  she would give me a home visit so how could I be home and work

15  at the same time and --

16           THE COURT:  Well, do you admit to the violations as

17  outlined in this petition?

18           THE DEFENDANT:  This is the first time I seen this

19  violation so I didn't even get a chance to read them.

20           THE COURT:  Well, do read it.  They do not include

21  anything about the --

22           THE DEFENDANT:  Okay.

23           THE COURT:  -- burglary charge.

24           MR. BRENNAN:  May he be seated, Your Honor?

25           THE COURT:  Yes.

1            (Pause in proceedings.)

2            THE DEFENDANT:  Yes, I -- I -- as far as seeking the

3    outpatient treatment, as far as me claiming that I called out

4    saying that I rescheduled for a bed, I was on a waiting list

5    for inpatient treatment at the V.A.  I was analyzed and I was

6    told that I was not -- did not qualify for inpatient to -- to

7    the fact that it was people who needed it more than me.  And

8    the fact that I was working everyday and I would go to the

9    outpatient treat -- treatment twice a week with my busy

10   schedule and I was taking -- going to take the urines here

11   every week.

12           And as far as the visits -- the home visit, I got a

13   letter from her that my mother's boyfriend never gave to me.

14   I hadn't -- it was two weeks when I got the letter saying that

15   I had to report to her on a Wednesday or she would put a

16   warrant out for my arrest.  That was two -- two weeks prior so

17   that's when the warrant was issued so that's when the problems

18   -- I had to make a choice to either stay at my job which they

19   didn't know that I was on a supervised release.  I feared that

20   I was going to lose my job.

21           Since I've been arrested, I contacted my job.  They

22   said that I can have my job when I get out, whatever, but that

23   was the main issue.  I didn't want to lose my job so as far as

24   Ms. -- Ms. Schoonmaker not compromising at all with me when I

25   would come late, I would not get home till 8:00 so I could not

1    be there at 7:00 which -- before 6:00 so --

2              THE COURT:  Did you tell the probation officer that

3    you were working for PHA?

4              THE DEFENDANT:  At the time -- at the time, I

5    started working in February but at that time, I was working

6    over in Jersey so I had to take two buses but --

7              THE COURT:  Did you ever tell her that you were

8    working for PHA?

9              THE DEFENDANT:  No.  I got that job in February.

10             THE COURT:  February, '07?

11             THE DEFENDANT:  Yes.  I was working over in Jersey

12   during the time.  All -- since my release, then -- release in

13   2006, I've been working but this is a steady job that I have

14   now.

15             So when she -- I read the letter saying I would have

16   the warrant so if report and get the warrant, I'd be locked up

17   anyway so I just, you know, decided to stay on the job.  And

18   when she came to get me, I figured, you know, there's nothing

19   I can do -- I just have to take the punishment.

20             THE COURT:  So, you deny that you were in violation

21   of supervised release with respect to the out -- inpatient --

22             THE DEFENDANT:  Yes.

23             THE COURT:  -- requirement?

24             THE DEFENDANT:  Yes, I'm -- see, I'm not doing -- I

25   went to the outpatient treatment because of me, not because I

1    was demanded, you know, I just did it for my own sake.  So,

2    I -- I went and -- I sought out treatment but they analyzed me

3    and said that I didn't have to go to inpatient treatment

4    because down the V.A. is more severe cases than I was.  You

5    got homeless guys down there.

6              So, they said I have to wait for a bed so I was

7    doing the outpatient treatment, you know, then I had to go

8    make that appointment and I had to go take the urinalysis,

9    then, I had to be at home when she told me to be at home, so,

10   you know --

11             THE COURT:  Were you given a date of November 7,

12   2006?

13             THE DEFENDANT:  Not -- never -- I don't know where

14   she got that date from.  I have no idea where she got that

15   date, and she -- now, I explained to her --

16             THE COURT:  When was the last time you contacted the

17   V.A.?

18             THE DEFENDANT:  In January.  I had to get my

19   medicine from the V.A.  My Dilantin and my blood pressure

20   medicine.

21             THE COURT:  When was the last time you contacted the

22   V.A. about inpatient treatment?

23             THE DEFENDANT:  Mr. Allen -- I contacted Mr. Allen

24   back in December and it was still -- well, I was going -- at

25   that time, basically, I was working and as far as inpatient

Colloquy                                    12

1    treatment, I thought I was, you know, well enough, you know,

2    to keep outpatient treatment.  So, basically, Mr. Allen was

3    very busy with the other veterans, so.

4           You know, and I talked to Ms. Schoonmaker.  She said

5    it was okay, you know, I had no ideas that she would violate

6    me for that issue.

7           THE COURT:  What was okay?

8           THE DEFENDANT:  That I just remain with the

9    outpatient treatment.

10          THE COURT:  When did she tell you that?

11          THE DEFENDANT:  She told me that on a home visit.

12          THE COURT:  When?

13          THE DEFENDANT:  Back in November.

14          THE COURT:  Why didn't you contact her after

15   November?

16          THE DEFENDANT:  The problem was, she told -- they --

17   the Probation Department went to a color-based urinalysis.  My

18   color was black.  I would call everyday to see if I -- which

19   day I take the urinalysis.  She said that I had -- didn't have

20   to see her anymore, basically, just I -- just to see her to

21   bring in my pay stubs or whatever.

22          So, I was taking a urinalysis, then, one -- two

23   weeks later, she had came for the home visit --

24          MR. BRENNAN:  Excuse me, Mr. -- may I just have a

25   moment, Your Honor?

1              (Pause in proceedings.)

2              MR. BRENNAN:  Thank you, Your Honor.

3              THE DEFENDANT:  I'm not a -- I mean, I'm not sitting

4    here, well, I might have misunderstood what she meant about me

5    getting inpatient treatment.  I'm not trying to throw her

6    under the bus but like I said, I have no idea of why she put

7    down what she put, but as far as me calling the V.A. saying

8    that I didn't want the bed, I did not do that.

9              I couldn't get a bed anyway because it wasn't ready

10   for me.  I was analyzed and they -- they came to the decision

11   that I didn't need inpatient treatment.

12             THE COURT:  Thank you.  I'll hear from the probation

13   officer with respect to the inpatient treatment.

14             MS. SCHOONMAKER:  During my visits with Mr.

15   Williams, we frequently talked about treatment at the V.A. and

16   he every time would tell me that he was waiting for an

17   inpatient date.

18             If I could look up my notes, I can find one that --

19   where he told me that --

20             THE COURT:  The defendant was required by the Court

21   to participate in a drug aftercare program and intensive drug

22   treatment program.

23             MS. SCHOONMAKER:  Yes.

24             THE COURT:  And the V.A. program was acceptable as

25   such a treatment program.

Colloquy                                    14

1              MS. SCHOONMAKER:  Yes.

2              THE COURT:  Did you excuse Mr. Williams from

3     compliance with the Court's direction?

4              MS. SCHOONMAKER:  No, I did not.

5              THE COURT:  At any time?

6              MS. SCHOONMAKER:  No.

7              THE COURT:  Did you tell him that if he enrolled in

8     an inpatient treatment program and participated in it, that

9     would satisfy the condition of intensive drug treatment?

10             MS. SCHOONMAKER:  I did not have that specific

11     conversation about inpatient treatment being the final

12     treatment.

13             THE COURT:  Well, not final treatment but that --

14     that was what was required by the Court order.

15             MS. SCHOONMAKER:  Yes.

16             THE COURT:  In the petition, it says that Mr.

17     Williams was given a bed date of November 7, 2006, by Mr.

18     Allen.

19             What is the basis for that representation?

20             MS. SCHOONMAKER:  When I spoke to Mr. Allen, he told

21     me that he had scheduled Mr. Williams twice for inpatient

22     treatment and he failed to follow through with the last bed

23     date.

24             THE COURT:  And that date was November 7?

25             MS. SCHOONMAKER:  Yes.

1           THE COURT:  Did Mr. Williams advise you that he

2    could not participate or he thought he couldn't participate in

3    the inpatient program because he was working, it would

4    interfere with his work?

5           MS. SCHOONMAKER:  No.

6           THE COURT:  Where did you believe he was working?

7           MS. SCHOONMAKER:  He told me that he was calling to

8    Manpower every day looking for work.  He never reported any

9    stable employment.

10          THE COURT:  Were you under the impression he was

11   working in New Jersey?

12          MS. SCHOONMAKER:  Not at that time.

13          THE COURT:  When did you become aware that he was

14   claiming to work in New Jersey?

15          MS. SCHOONMAKER:  This was after the first violation

16   proceedings two years ago.  He worked for a short time in New

17   Jersey and, then, that ended and that was the last that I had

18   heard he was working in New Jersey.  He did not have any

19   steady employment.

20          After the last violation hearing, he never provided

21   me with any pay stubs or payments towards the special

22   assessment or the restitution and he never claimed to have a

23   steady job.

24          THE COURT:  Did he fill out reports with respect to

25   his work or lack of work?

Colloquy                                          16

1          MS. SCHOONMAKER:   The last report I have from him is

2    October.   He reported working for Boscov's in October and

3    September but never provided any pay stubs.   October, there

4    was no employment.

5          THE COURT:   What efforts, if any, did you make to

6    contact Mr. Williams on or after November 14, 2006?

7          MS. SCHOONMAKER:   I went by the house and I left

8    appointment notices.   I spoke to his mother's boyfriend who

9    didn't know where he was or he wasn't home so I would leave an

10   appointment notice for him to come in.

11         The last appointment notice I left at his house was

12   on December 8th.

13         THE COURT:   Was anyone home at the time?

14         MS. SCHOONMAKER:   December 8th -- no.

15         THE COURT:   Did you ever send a letter to his

16   address?

17         MS. SCHOONMAKER:   I did not mail any.   I left an

18   appointment notice with his mother's boyfriend on November

19   20th to come in on November 22nd.   But he was also supposed to

20   be reporting for the urine testing through the Code-A-Phone

21   Program which he was not doing as well.

22         THE COURT:   How did that work?

23         MS. SCHOONMAKER:   He would have to call a phone

24   number every day and he was assigned a color.   If his color

25   came up, he would have to come in the next day for testing.

Colloquy                                                    17

1              THE COURT:  On what dates did his number come up, if

2      you --

3              MS. SCHOONMAKER:  We started the program at the

4      beginning of -- the beginning of November.

5              The first time his color came up was November 16th.

6      The second time was November 22nd.  The next was December 6th.

7      The next was December 13th, then, on the 21st, December 28th

8      and January 4th at which time I had to issue the warrant.

9              THE COURT:  Was he taken out of the Code-A-Phone

10     Program at that point?

11             MS. SCHOONMAKER:  Yes.

12             THE COURT:  Under violation B to which defendant --

13     as which the defendant admits the violation, what medication

14     was the defendant taking?

15             MS. SCHOONMAKER:  He told me that he may have taken

16     his girlfriend's prescription of Tylenol 4 with codeine which

17     would result in a morphine positive.

18             He tested positive one other time but he did have a

19     valid prescription for that --

20             THE COURT:  For morphine?

21             MS. SCHOONMAKER:  -- and I did not charge him with

22     that.

23             THE COURT:  Was it for morphine that he previously

24     tested positive?

25             MS. SCHOONMAKER:  No, it was hydrocodone.

1          THE COURT:  And what prescription did he have?

2          MS. SCHOONMAKER:  He had a prescription for

3   hydrocodone and tested positive for hydrocodone at a different

4   time.

5          THE COURT:  From what condition did he suffer so as

6   to have a prescription?

7          MS. SCHOONMAKER:  He claimed to have had an abscess

8   on his bottom and had to go to the hospital.

9          THE COURT:  All right.  Anything else, Mr. Brennan,

10  on claimed violation C, the V.A. inpatient program?

11         MR. BRENNAN:  No, Your Honor, only what the

12  defendant has offered as mitigation or an explanation for

13  his --

14         THE COURT:  I find by preponderance of the

15  evidence --

16         MR. BRENNAN:  -- failure to attend.

17         THE COURT:  -- that the defendant has failed to

18  report to the V.A. Hospital for inpatient treatment on

19  November 7, 2006 and thereafter.

20         By his admissions and by the Court's findings, the

21  defendant stands in violation of the conditions cited --

22  conditions of supervised release cited.

23         The question before the Court now is whether or not

24  there should be revocation of the supervised release.  What is

25  the position of the prosecution?

1          MR. TROYER:  Your Honor, the Government asks that

2     the Court does revoke the defendant's supervised release.

3          This -- this defendant has -- has proven himself to

4     be just completely non-amenable to supervision.  He -- he

5     doesn't abide by conditions.  He doesn't comply with the

6     conditions mandated by the Court.  He doesn't report to the

7     Probation Department and, then, after a series of those, he

8     absconds and this has been a repeated pattern.

9          Were this the first time the defendant was in -- in

10    front of this Court for violations of supervised release,

11    then, perhaps revocation might be too harsh a sanction but

12    this is not the first time.  This defendant has been before

13    this Court repeatedly and the pattern of conduct is -- is

14    remarkable.

15         Again, it's always the same, failure to comply,

16    failure to report; he absconds, then, he gets picked up on --

17    until -- on his next arrest and brought before the Court.

18         He's always got an explanation.  He's always got an

19    excuse.  He always blames somebody else for his problems.  He

20    blames the Probation.  He blames the V.A.  He says it's always

21    somebody else's fault.  It's always somebody else's fault

22    except Anthony Williams according to Anthony Williams and,

23    again, he's doing the same thing here.

24         Normally, we would want the defendant to remain on

25    supervised release in this situation because he still has an

1   outstanding balance of his restitution and he hasn't even paid

2   his special assessment over all these years from 2002.  But in

3   this circumstance, I -- I don't think that supervision is

4   anything but -- but, frankly, a waste of time and -- and

5   Government money on Anthony Williams.

6          And as a result, I think what -- the only thing the

7   Court can really do is, based on Anthony Williams' own

8   conduct, is -- is to warehouse him, is to punish him for his

9   violations and because then the question becomes, you know,

10  what -- what sanction should be applied and -- and I know that

11  the Guideline range is seven to 13 but Mr. Williams has been

12  incarcerated now for nine months.

13         He -- he is entitled to credit time served for the

14  nine months that he's be in under -- under -- and I think that

15  would -- to simply give him a Guideline range sentence which,

16  of course, are only advisory and have only -- always only have

17  been advisory in -- in these situations anyhow would -- would

18  be practically to reward Mr. Williams for his bad conduct and

19  would affirm Mr. Williams' obvious view that he has that he

20  can just play the system every time and just fail to comply

21  with every -- every Court mandate.

22         THE COURT:  What is the statutory maximum for a

23  violation?

24         MR. TROYER:  I am urging the statutory maximum which

25  is 36 months in this case.  Mr. Williams has -- has earned

1    that sentence at this point and -- and, again, I think,

2    this -- in this situation, he is in that small category --

3    category of persons who just will not be supervised, will not

4    comply and will not respect the -- the orders of the Court.

5          I might add, too, that he was not, despite his

6    claims here today, was not getting drug treatment because he

7    yearned for drug treatment and it was all something he was

8    doing on his own.

9          This defendant came before this Court last time

10   and -- and his excuse -- his main excuse of many last time was

11   that, well, whatever problems I had, I've had a drug problem,

12   it's because I have drug problems and I need drug help.

13   And -- and that's why that was mandated.  It was -- it was

14   ordered by the Court and it was ordered by the Court at the --

15   essentially, at the defendant's request or, at least, because

16   of the defendant's own claims.

17         Now, he comes in and he says, well, I didn't really

18   need it but I wanted it, and so, you know, no harm, no foul,

19   essentially.  And that's just simply not -- not the case.  He

20   even tried to claim he didn't read the petition before he came

21   into Court.

22         He says, oh, I have a job.  He comes in, he offers

23   last minute submissions.  I can't -- we can't verify whether

24   there's any -- any employer who's really willing to take him

25   on.  But even assuming that there is with this last minute,

1   unverified submission of Mr. Williams which he always seems to

2   have ready on the day of Court but not before, Mr. Williams

3   never reported that -- that employment to his probation

4   officer and, of course, he didn't because he was a fugitive

5   then.

6        If, as he claims, he -- he obtained that current --

7   or that last job in February of 2007, that was -- that was

8   three months, almost three months, after the last time he saw

9   his probation officer and he was already in fugitive status

10   then.  So, he -- he was not -- he was not compliant whether or

11   not he -- he had a job.

12        And, so I think, unfortunately, this is really --

13   Mr. Williams really doesn't leave the Court with too many

14   options here, I mean, viable options, perhaps, I would submit.

15   And, I think, the only thing -- only reasonable option is

16   to -- is to sentence Mr. Williams to the amount of time that

17   he has earned which -- which in the Government's view is 36

18   months and to revoke his supervised release.

19        THE COURT:  Does the Government seek a re-imposition

20   of the supervised release?

21        MR. TROYER:  No, I'm not because I don't -- I don't

22   believe Mr. Williams will -- will ever be -- be amenable to

23   supervised release.  I think supervised release is -- is

24   something that's -- that is not -- frankly, it's going to burn

25   up more Government resources.  It will not -- it certainly

1    will not help Mr. Williams.  I don't think it's going to be

2    beneficial to the Government either.

3              THE COURT:  And how about the fine and the special

4    assessment?

5              MR. TROYER:  The special assessment, obviously, he

6    still owes and -- and he would be -- he has to pay that.  It

7    is mandatory, but I -- although, quite frankly, I -- I doubt

8    that we'll ever see that money.

9              THE COURT:  Mr. Brennan?

10             MR. BRENNAN:  Your Honor, would the Court permit me

11   to call Baaqia Badia on the defendant's behalf?

12             THE COURT:  Yes.

13             MR. BRENNAN:  Ms. Badia, would you step up, please?

14             Where would you like her, Your Honor, the podium

15   or --

16             (Pause in proceedings.)

17             COURTROOM DEPUTY:  Please state your full name for

18   the record and spell your name for the record.

19             THE WITNESS:  Baaqia Badia, B-A-A-Q-I-A, last name,

20   B-A-D-I-A.

21             COURTROOM DEPUTY:  Please raise your right hand.

22             BAAQIA BADIA, DEFENDANT'S WITNESS, SWORN

23             COURTROOM DEPUTY:  Thank you.

24             MR. BRENNAN:  Ms. Badia, this is an opportunity to

25   speak to the Court, not necessarily about facts or

1   circumstances of the case but more to reasons that the Court

2   should fashion an appropriate sentence for Mr. Williams, your

3   fiancé.

4           MS. BADIA:  I believe he has been trying -- in fact,

5   I know he has been as far as going to the V.A. because there's

6   been a time where I took him to the V.A. where we were at the

7   Y and he said something about hypertension so he has gone

8   there and he has gone to seek drug counseling as well.

9           He even on the weekends late at night -- my mom is a

10  recovering addict in Narcotics Anonymous and she has 17 years

11  clean and he has meetings with my mom, and they would talk

12  about recovery and addictions, other addict and things like

13  that.

14          THE COURT:  Were aware of his conditions since

15  supervised release?

16          MS. BADIA:  Supervised release, no.  Only thing I

17  know, when he told me that he had to report, you know, I know

18  he was working over in Camden.  And when -- this was like, I'm

19  going to say, around, like, October of '06.  He was working

20  over in Camden and I know he did go for a job at Boscov's

21  because he was excited and he did let the probation officer

22  know that as well.

23          And as far as the job with PHA, that is still

24  available upon his release and he has been trying very hard

25  and he has been trying all the way around the board and I just

1    see the change in him since I've known him from what he used

2    to do as to what he's doing now.

3              And as far as him saying that, you know, he's

4    getting too old.  He has to make a change and if he was given

5    an opportunity, that he would not make that mistake ever again

6    and I believe him.

7              THE COURT:  Any questions?

8              MR. TROYER:  Ma'am, were you  -- were you aware

9    that -- that he's -- that he was a fugitive?

10             MS. BADIA:  No.

11             MR. TROYER:  Were you aware that he wasn't reporting

12   to -- to the probation officer since November of 2006?

13             MS. BADIA:  No.

14             MR. TROYER:  He didn't share that with you?

15             MS. BADIA:  No.

16             MR. TROYER:  All right.  Thank you.

17             THE COURT:  Thank you, ma'am.

18             MR. BRENNAN:  Thank you, Ms. Badia.

19             Your Honor, again, with regard to much of what the

20   prosecution has said with regard to the chronology of the

21   matter, the defense has no dispute.  We have been here more

22   than once.

23             Your Honor, I'm -- that concludes my remarks.

24             THE DEFENDANT:  Okay.  I'd like to say something,

25   Your Honor.

Statement by Defendant                                    26

1          Okay.  I was here more than once but the violations

2     when I was here last time, I was -- I was here for an arrest

3     and after everything was said and done, I -- I was -- the

4     arrest was dismissed.

5          As far as me not seeking treatment for the -- of the

6     -- it says right here I -- I received treatment on October the

7     18th and I got a bed date.  That was -- I did -- they was

8     going to give me a bed date but I was not analyzed for

9     inpatient treatment so as far as me working, she knew -- I

10    never -- she stated that I was before her two years ago.  She

11    wasn't even my probation officer.

12         The last time I was here, it was in August the 8th

13    and she knew that I was working over in New Jersey.  That was

14    one of the conditions, that I had to go get a job.  So she

15    stated that she had no idea I was working over in Jersey and

16    as far as the morphine, I stated to her that I was taking the

17    hydrocodone.  I don't know if that would tested positive for

18    morphine.  So as far as this -- the record --

19         THE COURT:  Did you take your girlfriend's

20    medication?

21         THE DEFENDANT:  I took a Tylenol 4 but it was, yeah,

22    the Tylenol 4, that's what I told them.  But I thought that

23    was codeine.  It was a -- oxycodone was the same thing.  I did

24    have a cyst -- I gave her the prescription.  I gave her the

25    prescription.  I had a cyst.  I had a little minor surgery and

1    I had the prescription and it -- and it validated around the

2    dates.

3            And as far as me taking the urinalysis, I was going

4    to be taking a urinalysis and working.  So, and for the

5    violations before, I was -- yes, I was here before, but as far

6    -- I was here for a Class A violation and Class C, all for

7    coming late, not showing up and the reason why I wasn't

8    showing up, last time I was here, it was for, like, minor

9    infractions.

10           So I know it seems like I've been here a lot and,

11   yes, I did say I needed the drugs.  I -- I was seeking drug

12   treatment.  I was seeking -- now, she was coming around, I was

13   talking -- and she, like, commended me for how I changed, and

14   I was seeking drug treatment.  I had to go to the V.A. to get

15   my medicine.

16           So as far as the 36 months and I've been -- I was

17   incarcerated for nine months for the last time I was here.

18   So, it wasn't like I was just, you guys, I was just getting a

19   slap on the wrist.  I -- I was incarcerated nine months so --

20   and this -- and I've been incarcerated two months so you might

21   not have to revoke my probation but I was serving jail time

22   and these are Class C violations, all for minor infractions.

23   I was going to take my urinalysis.

24           When she came to my house, my mother's house, she

25   gave a slip to my mother's boyfriend.  I didn't get that slip

1    till two weeks later.  She never called or even mailed the

2    letter.  He's senile so I just looked into the mail and I seen

3    it and the -- the warrant was already issued.  So, it was

4    either turn myself in or get locked up or continue working.

5             So, I know it seems like I've been here over and

6    over again but I was here for a Class -- eight, nine months

7    arrested for a Class A violation that I didn't do, you know,

8    and these are Class C violations.  All together, I've been --

9    and my sentence was only 19 months for my total sentence and

10   then to get -- try to get me for 36 months for these minor

11   infractions.

12            I know I need help and I know I put myself in

13   situations that I shouldn't, I know, I used bad judgment but

14   it's an ongoing thing with the addiction.  And I did seek help

15   and she knows that I seek help -- it was for six months I've

16   been free and as you -- my fiancé, had a lot of things to do.

17   I was living with my mother.

18            The stress of living with my mother and dealing with

19   that, working with no car and I was -- the last time I was

20   here, I showed you that I was taking care of my daughter in --

21   she goes to college in Florida.  I gave her money orders.  I

22   need to be out here on the street.  But as Mr. Troyer's trying

23   to say that I've been getting slaps on the wrist and I

24   haven't.

25            The last time, I was in nine months.  I've been

1   locked up two months.  That's a -- I put myself in situations

2   where I should not.  At my age, I should not be putting myself

3   there.

4          As far as my addiction, yes, I -- it's -- it's

5   something I have to take care of myself and being locked up is

6   not because I could get out and still do the same thing.  I'm

7   working now and I can verify that.  That's -- they went and --

8   this is the first time.  No one contacted me, no one gave --

9   not only this, this is the first time me saying this.

10         I've been locked up two months so I never saw -- the

11  reason why I'm giving -- bringing this stuff is because this

12  is the first time I even read this.  So how can I present

13  something to the Court earlier and no one comes to see me so I

14  can present it to the Court.  I'm just over across the street

15  sitting.

16         So as far as the 36 months, I know I violated but

17  they're making it look worse than it really is.  I was taking

18  the urinalysis.  If it -- ask her how many times that I did

19  take the urinalysis.  She comes to my house knowing that I'm

20  at work.  So if you come in the daytime and then you give a

21  letter to my mother's boyfriend --

22         THE COURT:  How does she know that you're at work?

23  You didn't tell her that you were working.

24         THE DEFENDANT:  I -- I told her if the conditions

25  was for me to get a job, she knew that I was working.  If --

1   if I went and -- if she didn't -- she would have violated me

2   if she knew I was -- I was out there three months and finding

3   a job --

4           THE COURT:  She just told me you didn't tell her

5   that you were working at PH --

6           THE DEFENDANT:  I said, with PHA -- at the time, I

7   wasn't working at PHA.  I was working over in Jersey.  I've --

8   see, the slips, the monthly -- she got -- she got to have the

9   monthly slips that my pay.  Tell her to produce them.  Produce

10  the slips.  She had -- for me, I had to fill out one every

11  month.  I know she has them.  She knew I was working.  She has

12  to have them.  As to -- I filled them out.

13          Every time you go to Probation, I filled out the

14  month -- monthly reports, okay.  Ask her, do she have them.

15  She told me that, she wouldn't -- she would have violated me

16  way back then if I didn't fill them out.  So, she's coming in

17  today saying that I never filled out a monthly report.  And I

18  -- my lawyer asked if I did -- if she can produce a monthly

19  report, that will prove that -- that she knew I was working

20  over in Jersey and I know she has to have one.

21          THE COURT:  Anything else?

22          MR. BRENNAN:  I'm going to wait until Mr. Williams

23  is finished.

24          THE DEFENDANT:  I would like for her to produce the

25  monthly reports that I -- I mean, she has to have it.

1          THE COURT:  Mr. Brennan?

2          MR. BRENNAN:  You finished?

3          THE DEFENDANT:  Yeah.

4          MR. BRENNAN:  Your Honor, I do have some other

5     remarks.

6          As often happens in -- in various matters with the

7     Court, there's a difference in the style or approach between

8     the lawyers' manner of handling things and the client's.  Mr.

9     Williams certainly has the right to speak but what I was about

10    to say earlier was, the case is what it is.  This is not the

11    first time we've been here; however, Your Honor, I'd ask the

12    Court when the Government asked you to warehouse Mr. Williams,

13    it's excessive, Your Honor.

14         If this was the first time we were here, I would ask

15    the Court to give Mr. Williams every opportunity, which the

16    Court has done in the past.  But to -- to jump from that end

17    of the spectrum to a request to warehouse him when really

18    there -- it appears to me, and I argue to the Court,

19    hopefully, it appears to the Court, that the difficulties Mr.

20    Williams has had in complying with what would seem to be some

21    fairly straightforward, easy to comply with rules and

22    regulations, seem to be substance abuse related.

23         I would argue to the Court that there's no need to

24    warehouse a defendant who is working.  He did not notify the

25    P.O. for several reasons, not the least of which was as he

1    said earlier, he was afraid to notify the P.O. for -- or

2    notify the job for fear of losing the job.  And during his

3    time out, the -- the recurring problem is this inability to

4    deal with the substance abuse issues.

5           So, I'd ask the Court to fashion an appropriate

6    sentence, not a warehousing-type sentence.  I don't think it's

7    appropriate.  I argue it's not appropriate but whatever

8    sentence the Court fashions, I'd ask -- I think the

9    Government's in agreement that Mr. Williams be credited for

10   the nine months that he has been in.  It may be longer now

11   because I believe that nine months was from a prior

12   incarceration related to this matter and that drug therapy be

13   part of the program.

14          Mr. Williams has asked for it and I think that it's

15   obvious that he's in need of it and --

16          THE COURT:  Well, it's not -- he says he doesn't

17   need it and there's no evidence that he failed to report to

18   the probation officer because he was having drug issues.

19          MR. BRENNAN:  It's -- it's a bit of a conundrum,

20   Your Honor, but I -- I believe that he may -- he may -- and he

21   certainly just reiterated to me, he may have walked the line

22   on that so to speak but he does need it.  He's aware that he

23   needs it.

24          Thank you, Your Honor.

25          Judge, well, also, just so the record's clear, Your

1    Honor.  I did, in fact, meet with Mr. Williams at the FDC, I

2    think, about a week or ten days ago and we discussed the fact

3    that these were Class C violations and what the ranges were.

4    And Ms. Badia was in my office, I believe, on Monday and I --

5    I don't believe that we had a copy of the petition to give

6    her.  We did give her the docket entry so Mr. Williams and I

7    certainly have discussed this matter prior to today.

8         THE DEFENDANT:  One thing, Your Honor, I was -- Ms.

9    Schoonmaker know -- knows that I was seeking outpatient

10   treatment on Germantown Avenue.  I was going three times a

11   week so I did make the -- she knew I was trying to better

12   myself.  So, I did not disregard my probation.  I did -- I

13   know that I need help.

14        So what the V.A. does, they -- they send you out to

15   certain outpatient treatment.  You have to go three times and

16   they -- is called ARU.  I was going every week.  I was

17   going and she knew I was going every week.  So what -- what

18   would happen was, when they got into the urinalysis, the

19   confusion -- I would go take the urinalysis and I wouldn't go

20   see her but she was coming around on the home visits.

21        So as far as my thing is, I can't make -- I used

22   some bad judgments -- when I seen that she gave me that letter

23   saying that she would put a warrant for my arrest if I didn't

24   go see her, it was two weeks after she gave me the letter.

25   So, that's where the confusion came in.  It wasn't like I was

1    just -- like I walked out and was not going to see her when --

2    going to take my urinalysis.  That's where the problem came

3    in.  That's where the problem came in, but I was -- she knew

4    that I was going to outpatient treatment.

5           As far as me going to the inpatient treatment, they

6    said that I didn't qualify for the inpatient treatment as of

7    that moment.

8           THE COURT:  You were arrested for burglary?

9           THE DEFENDANT:  Right.

10          THE COURT:  Where were you when you were arrested?

11          THE DEFENDANT:  I was -- I was -- I was at my

12   grandmother's house.

13          THE COURT:  Thank you.

14          THE DEFENDANT:  All right.

15          THE COURT:  Supervised release is revoked.  The

16   defendant is committed to the custody of the Bureau of Prisons

17   for a period of 30 months.

18          The defendant has in the past been given by this

19   Court many opportunities to comply with the conditions of

20   supervised release.  More than once, the Court has reiterated

21   to the defendant the importance of reporting.  This defendant

22   took it upon himself not to report.  He made bad choices.  He

23   now asks the Court to excuse him from those bad choices.

24          In effect, he sought to administer his own

25   supervision, to be the Judge in the case, in effect.  Well,

1    he's not the Judge in the case and he deserves to be punished

2    for his violations and he is being punished for 30 months.

3    The conditions, a fine, and special assessment are reimposed.

4              The defendant will be given credit for the time he's

5    been in Federal custody awaiting disposition of this petition.

6    That's two months at most as I understand it.

7              If he's been in incarceration in the state system on

8    the burglary charge, that's not to be credited.

9              The nine months previously imposed for previous

10   violations is not credited.

11             Anything further?

12             MR. BRENNAN:  Your Honor, three -- two and a half or

13   actually three requests; one would be that to the degree that

14   the Court is willing that the Court recommend to the BOP that,

15   if it's practical, that they house Mr. Williams as close to

16   Philadelphia as possible.

17             The second is that drug treatment be made available

18   to Mr. Williams at whatever facility he's at that he's --

19   because he is in need of it and he did acknowledge again today

20   that he's in need of it.

21             With regard to the -- to the nine months, I -- I

22   would ask the Court because I don't believe there's any

23   disagreement from the Government, I think it's unclear,

24   frankly, where if anywhere those nine months were credited to

25   Mr. Williams.  So, I would ask the Court that if the BOP

Sentence by the Court                                    36

1    decides that the nine months should've been credited for the

2    Federal sentence, that the Court allow it.

3              THE COURT:  If the Bureau of Prisons determines that

4    nine months should be credited in addition to other time,

5    then, nothing that I've said will countermand that.

6              MR. BRENNAN:  Understood, Your Honor.

7              THE COURT:  I don't -- I don't see that these two

8    things are connected.  These are new violations.

9              With respect to the request that he be incarcerated

10   at someplace close to Philadelphia, that request is denied.

11   The Bureau of Prisons will place him wherever he can be

12   placed.

13             With the request that he be enrolled in a drug

14   treatment program, I don't think that such exists.  The Court

15   will recommend to the Bureau of Prisons two things; that he

16   participate in a drug counseling program, and number two, that

17   he be permitted to work in the prison work program under the

18   Financial Responsibility Program so as to pay the fine and --

19   and the special assessment.

20             MR. BRENNAN:  I didn't hear that, Your Honor.  I'm

21   sorry.

22             THE COURT:  So as to pay the fine and the special

23   assessment.

24             MR. TROYER:  I think that it wasn't a fine, but

25   actually restitution.  I think it was --

1            THE COURT:  Or restitution.

2            MR. TROYER:  -- $4,557.38 which was previously

3    imposed by -- by the Court but is -- has not been paid.

4            THE COURT:  The restitution and the special

5    assessment, those obligations are reimposed.

6            Is there anything further?

7            MR. BRENNAN:  No, Your Honor.

8            THE COURT:  I'm confused about this nine months.

9            MR. TROYER:  I -- I've conferred with the -- the

10   probation officer.  Apparently, he was -- it took the state

11   some time to pick him up for the warrant in the last charge.

12   It's -- it's not on the pending warrant.  It's on the previous

13   warrant.  So, I -- I don't know that he gets nine months

14   credit time served for -- for not being picked up by the state

15   on -- on the previous warrant.

16           I think it's just a -- I think that would only -- he

17   would only get Federal credit for time served for -- for this

18   violation for the current warrant.

19           MR. BRENNAN:  Your Honor, I spoke yesterday with Ms.

20   Schoonmaker about this very issue because I -- I discussed it

21   with the defendant at the FDC last week and none of us are

22   crystal clear on where it will go.  That's the BOP's decision.

23   But my -- my argument and for the record I would state that

24   it's my understanding -- my recollection that he was

25   incarcerated for nine months as a result of the pending

1    violation of -- prior to this.  We were here, I believe, on

2    August 3rd of the year 2006 and I'd ask that -- and I don't

3    believe there was any other sentence, Federal or state, that

4    that time was credited to.  I believe, he was incarcerated

5    because of Your Honor's detainer.

6            Ms. Schoonmaker can correct me if I'm wrong but, if

7    that's the case, I would -- I would argue to the Court and,

8    hopefully, the BOP will see it that if he did nine months and

9    it was related to this case and a violation in this case

10   albeit an earlier violation, that it should be credited to the

11   sentence.

12           THE COURT:  There being nothing else, Court stands

13   adjourned.  The defendant is remitted to the custody of the

14   Bureau of Prisons.

15           MR. BRENNAN:  Should I advise the defendant, Your

16   Honor?

17           MR. TROYER:  In terms of the --

18           THE COURT:  The defendant has ten days from today to

19   file a notice of appeal with the Court of Appeals.

20           Likewise, the Government has ten days from today to

21   file a notice of appeal.

22           MR. BRENNAN:  Thank you, Your Honor.  May we be

23   excused?

24           MR. TROYER:  Thank you, Your Honor.

25           THE COURT:  Yes.  Thank you.

1    Supervised release is not imposed.

2        (Proceedings concluded at 12:58 p.m.)

3                    * * *

4

5

6

7              **C E R T I F I C A T I O N**

8

9

10         I, Vivian Pomykacz, court approved transcriber,

11   certify that the foregoing is a correct transcript from the

12   official electronic sound recording of the proceedings in the

13   above-entitled matter.

14

15

16

17

18   _____   April 3, 2009

19   VIVIAN POMYKACZ

20   DIANA DOMAN TRANSCRIBING

21

22

23

24

25